CITY OF MILFORD *v.* HELEN F. MAYKUT ET AL.
(AC 29177)

Gruendel, Harper and Pellegrino, Js.

Argued February 18—officially released September 22, 2009

*Matthew B. Woods*, with whom, on the brief, was *Cynthia C. Anger*, assistant city attorney, for the appellant (plaintiff).

*Robert J. Sickinger*, with whom, on the brief, were *Paul J. Ganim* and *Richard Bepko*, for the appellees (defendant Virginia Miller et al.).

*Opinion*

HARPER, J. The plaintiff, the city of Milford, appeals from the judgment of the trial court increasing the

amount of compensation payable to the defendants[1] by the plaintiff in connection with the condemnation of certain real property. The plaintiff claims that the court improperly awarded the defendants compensation for the diminution in value of a hypothetical lot of a subdivision when there was no evidence that a subdivision could be achieved within a reasonable time.[2] Because we conclude that the court's determination of the value of the lot was not supported by sufficient evidence, we reverse in part the judgment of the trial court.

The following facts and procedural history are relevant to the plaintiff's appeal. On September 5, 2002, pursuant to General Statutes (Rev. to 2001) § 7-247,[3] the sewer commission of the city of Milford voted to acquire 0.17 acres of the 6.15 acre property of the defendants Virginia Miller and Helen F. Maykut located at 62 Herbert Street, Milford.[4] The plaintiff determined that the amount of compensation to be paid for the taking was $15,000 and, on November 18, 2002, deposited that amount with the clerk of the Superior Court.

[1] The defendants Virginia Miller and Helen F. Maykut purchased the subject property sometime during the 1970s, with Miller as a one-third owner and Maykut as a two-thirds owner. Maykut died on May 19, 2005. George W. Ganim, the executor of Maykut's estate, was substituted as a defendant on March 31, 2009. For simplicity, we refer to Miller and Maykut, as well as Ganim in his capacity as executor of her estate, collectively as the defendants. We refer to the individuals by name where appropriate.

[2] The plaintiff also claims that the court failed to give the plaintiff credit for the $15,000 it deposited with the court upon the filing of the statement of compensation. In light of our disposition of the plaintiff's first claim, which necessitates a new hearing on damages, and the principle that a deposit filed along with a statement of compensation is considered as part payment of an award, we decline to address this claim.

[3] General Statutes (Rev. to 2001) § 7-247 provides in relevant part: "Any municipality by its water pollution control authority . . . may enter upon and take and hold by purchase, condemnation or otherwise the whole or any part of any real property or interest therein which it determines is necessary or desirable for use in connection with any sewerage system . . . ."

[4] The plaintiff planned to use the land as a sewer pump station.

On December 23, 2002, the plaintiff filed a certificate of taking in the Superior Court. The defendants filed an appeal and application for review on April 11, 2003.

On August 24, 2007, a hearing was held to determine the amount of damages for the plaintiff's statutory taking. Miller testified that she was a Realtor and that she and Maykut purchased the property for investment, with the intention to subdivide and to develop the property in the future. Miller was unable, however, to state that the boundary lines contained on a surveyor's feasibility plan, marked for identification as exhibit four, fairly and accurately depicted the actual property lines. In addition, Miller was unable to testify as to the property's value.

The defendants also called the plaintiff's expert, Stephanie A. Gaffney, a certified residential real estate appraiser, and Ralph A. Bowley, a certified real estate appraiser, to testify. Both Gaffney and Bowley valued the property using a comparable sales approach but employed that methodology in different ways. Gaffney compared the 0.17 acre property to small pieces of property in Milford that had been purchased by abutting property owners at about the time of the taking. In doing so, she determined that the 0.17 acres had a value of $15,000. Bowley compared the proposed fourth lot,[5] encompassing the area that the plaintiff sought to condemn, to three recent sales of buildable residential lots in Milford to determine that the proposed 2.27 acre lot had a value of $170,000 at the time of the taking.

Gaffney testified that in 2002, the plaintiff asked her to appraise the 0.17 acre property that it intended to

[5] The feasibility plan, which was admitted for the limited purpose of showing the factual basis on which Gaffney and Bowley relied in determining the value of the taking, divided the property into four proposed lots. The area taken by the plaintiff for a pump station was located wholly within the proposed 2.27 acre fourth lot.

condemn. Gaffney testified that at that time, she did not appraise the effect of the taking on a possible subdivision of the property because she was unaware of a proposed subdivision. Gaffney conceded that land is often purchased and held for investment purposes, but she was asked by the plaintiff to evaluate only the portion of land that it had planned to condemn.

Gaffney further testified that in November, 2006, George W. Ganim, the executor of Maykut's estate,[6] asked her to appraise the hypothetical fourth lot as represented on exhibit four. Gaffney testified that in 2006, she placed a hypothetical value of $250,000 on that lot, *assuming it existed and that the subdivision creating such lot had been approved.* She testified that if the taking made the lot unbuildable, it would have a large impact on the value of the remaining portion of the lot. Gaffney testified that exhibit four shows that a large portion of the proposed fourth lot is wet and subject to regulation as wetlands but that the 0.17 acres taken by the plaintiff are dry. The defendants' counsel again offered exhibit four as a full exhibit, but the court sustained the plaintiff's objection. After additional testimony by Gaffney, the plan was admitted as an exhibit for the limited purpose of showing "how she arrived at her value, and what she used in arriving at it."[7]

Gaffney also testified that she did not know if the entire 6.15 acre property owned by the defendants was in fact capable of subdivision. She testified: "[C]ertainly,

---

[6] See footnote 1.

[7] Connecticut Code of Evidence § 7-4 (b) provides: "The facts in the particular case upon which an expert bases an opinion may be those perceived by or made known to the expert at or before the proceeding. The facts need not be admissible in evidence if of a type customarily relied on by experts in the particular field in forming opinions on the subject. *The facts relied on pursuant to this subsection are not substantive evidence, unless otherwise admissible as such evidence.*" (Emphasis added.) Accordingly, inadmissible evidence relied on by an expert may be admitted for the *limited purpose* of explaining the factual basis for the expert's opinion.

a six acre plus parcel in a one acre zone has the potential to perhaps be subdivided, but because of all the different factors, wetlands and, you know, so forth and so on, all the town regulations, and setbacks for the dwellings, and perhaps setbacks from the railroad, etc., etc., I couldn't say whether I felt that this was feasible or not, but certainly that size parcel lends itself to perhaps being subdivided." Gaffney testified that in valuing the property, she relied on the wetland line on exhibit four but that she lacked independent knowledge of the outlines or boundaries of any wetlands on the subject property. She testified that it was possible to configure the lots differently but that that was not her area of expertise, and she did not know if it was likely. She testified that in determining her valuation, she "rel[ied] on the surveyor's work to be accurate." Gaffney testified that the highest and best use of the 6.15 acres would most likely be a subdivision.

During cross-examination, Gaffney testified that she did not know if the Milford subdivision regulations would allow for the creation of the third lot, a rear lot, shown on exhibit four. Finally, she testified that she did not know if any counterpart of exhibit four had been signed by a professional engineer or registered land surveyor. On redirect examination, Gaffney acknowledged that a copy of exhibit four, marked for identification as exhibit five, was the same as exhibit four except that it was a signed copy. The defendants moved to enter the signed copy as a full exhibit, and, following an objection by the plaintiff, it was admitted under the same restrictions as to its proper use as the court had applied to exhibit four.

Also, Gaffney testified that "[i]f the subdivision were approved, and lot four existed, and—there's a lot of 'ifs' here, I'm sorry—and if in fact [the condemned property was] the only place that a dwelling could be built, then certainly I would approach it differently because in

effect, it has taken away the usefulness, the utility of that lot, but again, it's pending a lot of approvals from the city." She testified that she would not need the approval before determining a value but that the value would be assigned subject to subdivision approvals.

Bowley testified that he originally was engaged by the estate to conduct an appraisal upon the death of Maykut and then asked in January, 2007, to appraise the 6.15 acre parcel on the basis of the value of the taking as of September, 2002. Bowley testified that the value of the 0.17 acres was $170,000 because the taking would deprive the entire parcel of a fourth lot.

Bowley testified that the highest and best use of the 6.15 acre property was to subdivide the property for single-family residential housing. During direct examination, Bowley testified that he "basically valued lot number four in taking a look at how the taking impacted the possible location of the house, and, since it basically is the best piece of that lot, in terms of staying away from wetlands, being a viable location for a house, this was dead in the center of that particular section, so I looked at it as a detriment, and in fact a destroying of the real value of lot number four." With regard to an alternative placement of the house, Bowley opined that "the rear portion of this lot, which may have supported a building—you had to bring the driveway through what appears to be a wetlands, and that would require us to go to a wetlands board in order to get that driveway through, which I thought was a phenomenal risk. So, the most logical place and the easiest place to put the house is in the front."

On cross-examination by the plaintiff's counsel, Bowley testified that he did not know whether the zoning regulations in effect in 2002 in the city of Milford allowed for rear lots such as the second lot shown on exhibits four and five. Bowley conceded that he was

asked to appraise the fourth lot and that *if* that subdivision had been submitted and *if* it had been approved, the value of the fourth lot at the time of the taking would have been $170,000. Bowley admitted, however, that in his appraisal, he considered subdivision approval a certainty because he made *no adjustment* in his opinion for value because of the uncertainty. Bowley also testified that he did not know whether the wetlands depicted on the exhibit were accurate and that the existence of wetlands does not necessarily preclude the construction of a driveway crossing the wetlands to reach a buildable area in the interior of a lot. Bowley further testified that because of the uncertainty of obtaining wetlands approval to construct in a different area of the fourth lot, he discounted the possibility entirely in his appraisal.

The court issued its memorandum of decision on August 29, 2007, finding that the highest and best use of the 6.15 acre property was a subdivision as proposed in the 2006 feasibility study, creating four lots. The following relevant facts are set forth in the court's memorandum of decision. "The plaintiff's expert witness . . . Gaffney . . . testified that the value of the subject property at the time of the taking was [$15,000]. . . . Her appraisal approach seeks to attempt to directly determine the market value of the taking by ascertaining a value to the 0.17 acre piece of land that was taken by the [plaintiff]. The defendants' expert . . . Bowley [a senior residential appraiser], on the other hand, valued the taking at [$170,000]. . . . Bowley valued the taking by using a feasibility study that was done for . . . [the estate of] Maykut in 2006 . . . . The property that was condemned is located within the proposed subdivided lot, number 4. . . . Bowley opines that lot 4 is no longer a viable building lot because of the plaintiff's taking. He further opines that the value of lot 4, but for, and at the time of, the taking was $170,000. He

believes that as a result of the taking and the fact that the plaintiff placed a pumping station on the acquired property, lot 4 has no market value at all. . . . Bowley's conclusion is based in part due to the fact that there are wetlands on lot 4 and because of said wetlands, the property owner is limited by wetland regulations as to where a possible house on the property could be located.[8]

"Lot 4 as described in . . . exhibits four and five is approximately [99,059] square feet. Instead of directly trying to give a value of the [0.17 acre] area that was taken by the [plaintiff], he opines that the defendants' financial loss was the value of the entire lot. The defendants argued at the hearing that the pumping station was placed in the area where a house would have been located and that they cannot place a house anywhere else on the lot due to wetland regulations." (Citation omitted.)

The court also made the following findings of fact. "[T]he defendants also argue that the action of the plaintiff in taking the [0.17] acres renders the lot unbuildable; however, other than this conclusory statement, the defendants did not offer sufficient credible and convincing evidence to convince this court that the proposed lot was rendered unbuildable by the taking. The court notes that at no time pertinent hereto did the defendants file any applications with the local wetland regulating agency concerning building a house or other structures on the subject property. Although the defendants' appraiser concludes that the wetlands on lot 4 prevent the defendants from building a house on the proposed

---

[8] The court noted that "other than describing lot area calculations, exhibits four and five [do] not contain information such as the size or exact location of the wetlands. There are no measurements in terms of distances, metes or bounds. Furthermore, there is no indication as to the exhibits' accuracy. The court further notes that [Miller] could not testify that the wetlands as indicated on the exhibits [were] accurate."

lot because of the plaintiff's taking, other than the feasibility plan . . . this court was not provided with any surveys or evidence of any other kind demarcating the actual size and location of wetlands or wetland buffers. Furthermore, [Miller] acknowledged during the hearing that she could not testify that the wetland areas in [exhibits] four and five are accurate. Additionally . . . Bowley conceded that he was not an expert in the area of wetlands and the information that he had concerning the existence of wetlands on the subject property came from the aforementioned exhibits. . . .

"After considering all of the evidence, this court finds that the more credible and convincing evidence presented at the hearing of this matter proves that the highest and best use of the subject property is to subdivide the property into four lots as is indicated by the feasibility study. However, the court further finds that the credible and convincing evidence does not prove that the proposed lot 4 is an unbuildable lot because of wetland and taking issues. The court further finds that although the evidence did not rise to the level of proving that the proposed lot 4 was not an unbuildable lot, the evidence does prove that a combination of the taking and of the wetland concerns exacerbated by the taking did adversely affect what a willing buyer would pay a willing seller based on the highest and best possible use of the subject property. In light of the foregoing, this court finds that the defendants' property value at the time of the taking was [$170,000]. The court further finds that the taking diminished the property value by [$56,000] when it occurred, and the defendants are entitled to compensation in that amount." (Citations omitted.)

The plaintiff claims that the court improperly awarded damages for the diminution in value to an unsubdivided lot when there was no evidence that a subdivision was achievable within the reasonably near

future. Specifically, the plaintiff claims that the court improperly (1) determined the highest and best use without regard to whether there was a reasonable probability that the property would be subdivided in the reasonably near future and (2) valued raw land with little or no improvement as if the land was, in fact, a subdivision.

After the court issued its memorandum of decision in this case, our Supreme Court considered similar claims in *Bristol* v. *Tilcon Minerals, Inc.*, 284 Conn. 55, 931 A.2d 237 (2007). Because of its applicability to the issues before us, *Tilcon Minerals, Inc.*, plays a large role in our analysis.

I

The plaintiff challenges the court's reassessment of damages for the statutory taking, claiming that the court improperly determined the highest and best use of the property. We agree in part and disagree in part.

In *Tilcon Minerals, Inc.*, when addressing the claim that the trial court improperly determined the highest and best use of the property at issue, our Supreme Court stated that "[i]t is well established that [a] property's highest and best use is commonly accepted by real estate appraisers as the starting point for the analysis of its true and actual value. . . . [U]nder the general rule of property valuation, fair [market] value, of necessity, regardless of the method of valuation, takes into account the highest and best value of the land. . . . A property's highest and best use is commonly defined as the use that will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate. . . . The highest and best use determination is inextricably intertwined with the marketplace because fair market value is defined as the price that a willing buyer would pay a willing seller based on the highest and best

possible use of the land assuming, of course, that a market exists for such optimum use. . . . The highest and best use conclusion necessarily affects the rest of the valuation process because, as the major factor in determining the scope of the market for the property, it dictates which methods of valuation are applicable. . . . In determining its highest and best use, the [court may also] consider whether there was a reasonable probability that the subject property would be put to that use in the reasonably near future, and what effect such a prospective use [might] have had on the property's market value at the time of the taking. . . . Finally, a trier's determination of a property's highest and best use is a question of fact that [a reviewing court] will not disturb unless it is clearly erroneous. . . .

"[I]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, [reviewing courts] do not retry the facts or pass on the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) Id., 64–65.

In *Tilcon Minerals, Inc.*, our Supreme Court concluded that the trial court properly found that the highest and best use of the defendant's property was for a residential subdivision. Id., 65–66. The plaintiff in that case, the city of Bristol, claimed that the trial court improperly determined that a residential subdivision was the highest and best use of the condemned property, even though the defendant landowner had extended its mining permit for an additional two years before the taking and did not develop a residential reuse concept plan until after the plaintiff had exercised its power of eminent domain. Id., 62. Our Supreme Court

stated that the trial court had "carefully considered the testimony and written reports of the two expert witnesses as well as [the testimony of the defendant's director of real estate and environmental compliance] and found the [defendant's] witnesses to be more persuasive." Id., 66. There was evidence that the property was zoned for residential use, the mining operations were essentially completed before the taking, the defendant had prepared a concept plan *on the basis of town regulations* demonstrating the feasibility of subdividing the property, and the court had visited the site and observed its appropriateness for a residential subdivision. Id. In addition, there was evidence that the defendant previously had reclaimed and resold previously mined land for an industrial park and residential subdivision. Id. Our Supreme Court held that the fact that "the concept plan showing the feasibility of residential development was prepared for litigation purposes and that [the defendant] did not intend to develop or to market the property for single-family homes in the *immediate* future [did] not alter the fact that residential development would have yielded the highest market value, greatest financial return and most profit at the time of the statutory taking." (Emphasis in original.) Id., 67. Accordingly, our Supreme Court held that "the trial court's finding that there was a reasonable probability that the property could or would be used for residential development in the reasonably near future and its corollary finding that the highest and best use of the property was for residential development were not clearly erroneous." Id.

Likewise, we conclude in the present case that the court properly found that the highest and best use of the 6.15 acre property was for a residential subdivision.[9]

---

[9] In this case, the plaintiff's condemnation of 0.17 acres of the defendants' property is a partial taking. We agree with the court that the appropriate measure of damages for a partial taking is the difference between the market value of the whole tract with its improvements before the taking and the market value of what remained of it after the taking. See *Bristol* v. *Tilcon*

The court heard testimony that the land was in a residential one acre zone, that it consisted of approximately 6.15 acres and that it held only one house. Miller testified that she and Maykut were in the real estate business and that they purchased the property as an investment for later subdivision and sale. The court also heard testimony from both Gaffney and Bowley that the highest and best use of the property was a residential subdivision. That the defendants had no concrete plans to subdivide the property at the time of the taking does not change the fact that a residential development would have yielded the highest market value for the property at the time of the taking. See id., 67. Accordingly, the court's finding that the highest and best use of the property was as a residential subdivision was not clearly erroneous. For the reasons stated in part II, however, we conclude that the court's more specific finding, that the highest and best use of the subject property is to subdivide it into *four lots as indicated by the feasibility plan*, was clearly erroneous.

## II

The plaintiff also claims that the court improperly reassessed the damages for the statutory taking by valuing the 6.15 acre property using the lot method, despite the fact that no subdivision had been undertaken by the defendants. We agree.

"In actions requiring . . . a valuation of property, the trial court is charged with the duty of making an independent valuation of the property involved. . . . [N]o one method of valuation is controlling . . . . In determining the value of the property taken, the trier arrives at its own conclusions by weighing the opinions of the appraisers, the claims of the parties, and its own

*Minerals, Inc.*, supra, 284 Conn. 71. Accordingly, the appropriate determination of the highest and best use reflects the highest and best use of the whole tract.

general knowledge of the elements going to establish value, and then employs the most appropriate method to determine the damages that result from the taking. . . . [T]he trial court has the right to accept so much of the testimony of the experts and the recognized appraisal methods which they employed as he finds applicable; his determination is reviewable only if he misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was his duty to regard. . . . On appeal, it is the function of [a reviewing] court to determine whether . . . [the conclusions of the trial court] are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged [a reviewing court] must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . .

"Connecticut courts have recognized the well established constitutional principle that [t]he owner of land taken by condemnation is entitled to be paid just compensation. Conn. Const. art. I, § 11. If the taking is partial, the usual measure of damages is the difference between the market value of the whole tract with its improvements before the taking and the market value of what remained of it thereafter. . . .

"[R]aw land as such, with little or no improvements or preparation for subdivision may not be valued as if the land were in fact a subdivision . . . . The accepted rule for the evaluation of such land, therefore, is that the land will be considered in its present condition as a whole, with consideration given to any increment or enhancement in value due to the property's *present adaptability* to subdivision development. . . .

"In determining the adaptability of a property to residential use, [t]he landowner need not establish the

development potential of the property for the proposed use by a preponderance of the evidence, but only that it is reasonably so. The court is to value the tract of land only, and not to determine how it could best be divided into building lots, nor to conjecture how fast they could be sold, nor at what price per lot. Once the question as to the adaptability of a condemned tract of land for subdivision purposes has been answered, the real problem as to valuation must be faced. Does it enhance the market value and, if so, by how much. . . .

"Fair market value for the partial taking of land suitable for subdivision also may be determined by the lot method of valuation, in which the land is valued according to the number of buildable lots that the property can support. The lot method is most reliable in estimating value when substantial steps have been taken toward subdivision, as when portions of the tract already have been subdivided or partially developed, because tangible evidence of this nature clearly demonstrates the land's potential use as a subdivision. . . . In such cases, [t]he costs to the developer are no longer speculative, the value of the individual lots in the market may be ascertained with as much certainty as in any other condemnation proceeding, and the possibility of such a use is no longer remote. . . .

"A modified version of the lot method of valuation also may be used when few, if any, tangible steps have been taken toward subdivision of a property. Sometimes called the residual approach, an appraiser using this method estimates a sale price for each individual, developed lot, multiplies that price by the number of lots in the tract, then deducts the estimated costs of development and marketing to arrive at a final estimation of the property's value. *United States* v. *99.66 Acres of Land*, 970 F.2d 651, 655 (9th Cir. 1992); see also *Robinson* v. *Westport* [222 Conn. 402, 404–405, 610 A.2d 611 (1992)] (describing lot method as approach in which

land is appraised by establishing value of finished lots and then subtracting capital costs of improvements necessary to put them in that condition). *Sufficient evidence of the costs associated with subdividing, preparing and marketing the land, however, must be provided to ensure the integrity and accuracy of the valuation process.*

"When used in this state to value unimproved land, the modified approach to the lot method of valuation has been strictly applied. In *Robinson* v. *Westport*, supra, 222 Conn. 407, the trial court rejected the lot method of valuation employed by the parties' appraisers in estimating damages for a partial taking of the plaintiffs' undeveloped property because evidence as to the value of the hypothetical subdivision lots was too speculative . . . . On appeal, [our Supreme Court] affirmed the trial court's decision, emphasizing that [it] did not agree with the proposition that the lot method of appraisal should *never* be admitted in condemnation cases involving unimproved raw land . . . [but that] the better view . . . is that *a lot method appraisal can be admitted in appropriate cases if the proponent offers credible evidence of the costs of subdivision— e.g., the expense of clearing and improving the land, surveying and dividing it into lots, advertising and selling, holding it, and paying taxes and interest until all lots are sold.* . . . The potential value of land if subdivided could well be considered by a willing buyer and a willing seller where subdivision is a reasonable possibility and the costs of subdivision are not speculative or uncertain. . . .

"[Our Supreme Court] further stated in *Robinson* that, although a plaintiff need not take specific steps toward subdivision in order for the lot method to be considered, evidence of any attempts to prepare for a future subdivision [of the property] tend to make such use more reasonably probable and less speculative. As

the proponent of a hypothetical highest and best use is able to progress along the spectrum from raw land with few or no improvements to, ultimately, a completed subdivision, the weight to be assigned such evidence will be enhanced. [Our Supreme Court] finally acknowledged that [t]rial courts must be afforded substantial discretion in choosing the most appropriate method of determining the value of a taken property. . . . In condemnation proceedings, the trial court is more than a trier of facts or an arbiter of . . . [the] opinions of [expert] witnesses; it is charged with the duty of making an independent determination of value and fair compensation in light of all the circumstances, the evidence, its general knowledge and its viewing of the premises. . . . [T]he trial court [is] not, as a matter of law, bound by the valuations or valuation methods used by the appraisers but [may] consider the comparable sales of land that [are] in evidence as well as the raw data utilized in the presentation of the lot method approach in independently determining fair market value." (Citations omitted; emphasis added; internal quotation marks omitted.) *Bristol* v. *Tilcon Minerals, Inc.*, supra, 284 Conn. 70–75.

In *Tilcon Minerals, Inc.*, as in *Robinson*, the defendant property owner's appraiser "failed to provide the court with sufficient evidence to compare the property in question with the six subdivided properties described in his report. For example, there was little or no evidence regarding the actual cost of subdividing and holding the property, including the cost of surveying and dividing the property into lots, advertising and marketing the property to potential buyers and paying the required taxes, interest and other carrying costs of the property until it could be sold. Moreover, [the defendant] provided no time line indicating how long it would take to obtain the necessary subdivision approval or to locate a suitable buyer, which could have a significant

effect on the property's value, depending on market conditions." Id., 76–77. Because the defendant in that case did not provide evidence of such costs to the court, such as "the actual cost of subdivision approval, which could vary depending on the size and characteristics of the property in question and the nature and extent of modifications required to obtain local approval of the proposed subdivision plan," our Supreme Court concluded that the trial court's determination of value was speculative and uncertain and that the court's reassessment of damages was clearly erroneous. Id., 77.

In this case, as the court noted, the record is bereft of evidence of the proposed lot sizes and the size or exact location of wetlands on the lots.[10] In addition, Bowley's analysis, which the court adopted to determine the value of the proposed fourth lot, did not provide the court with an evidentiary basis on which to assess the property in the manner that it did. Bowley made no adjustments to value for the fact that the 6.15 acre lot was not in fact subdivided into four lots at the time of the taking. There is no evidence in the record of the zoning regulations that govern the subject property,[11] much less the expense of clearing and improving the land, surveying and dividing it into approved lots, advertising and selling, holding it and paying taxes and interest until all lots are sold. Without such evidence, we conclude that the court's determination of the value of the proposed fourth lot was not supported by sufficient evidence, and, therefore, the reassessment of damages was clearly erroneous. Accordingly, the case must be remanded for a rehearing on damages.

---

[10] Exhibits four and five were not admitted as substantive evidence but simply as the factual basis on which Gaffney and Bowley relied. In addition, Miller, Gaffney and Bowley were unable to provide substantive evidence about the property's boundaries, the wetland boundaries or the applicable zoning regulations, except that the subject property was within a one acre zone.

[11] See footnote 10.

The judgment is reversed only as to the award of damages for the statutory taking and the case is remanded for a hearing in damages. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.