******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBERT BARTON *v.* CITY OF NORWALK
(AC 36040)
(AC 36270)

Gruendel, Prescott and Pellegrino, Js.

*Argued October 28*, *2015—officially released February 23*, *2016*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Mintz, J. [motion to cite in]; Hon.
Taggart D. Adams, judge trial referee [judgment; motion
to award prejudgment interest].)

*Daniel J. Krisch*, with whom were *Mario F. Coppola*,
corporation counsel, and *Carolyn M. Colangelo*, assistant corporation counsel, for the appellant in AC 36040
and the appellee in AC 36270 (defendant).

*Elliott B. Pollack* and *Tiffany K. Spinella*, for the
appellees in AC 36040 and the appellants in AC 36270
(plaintiffs).

*Opinion*

GRUENDEL, J. The defendant, the city of Norwalk, appeals from the judgment of the trial court awarding the plaintiff Robert Barton[1] $899,480 in damages plus $543,384.49 in prejudgment interest for his claim that the defendant inversely condemned his building at 70 South Main Street in Norwalk (70 South Main) when it took the building's parking lot across the street at 65 South Main Street (65 South Main) by eminent domain. On appeal, the defendant raises two claims: (1) that the plaintiff was judicially estopped from asserting that the value of 70 South Main prior to the inverse condemnation should be calculated on the assumption that it had parking across the street at 65 South Main because—when the defendant took 65 South Main in the prior eminent domain proceeding—the plaintiff valued it and received just compensation for it, not as a parking lot, but according to its "highest and best use" as a mixed use development; and (2) that 70 South Main was not inversely condemned because the plaintiff's use and enjoyment of it had not been *totally* destroyed. The plaintiff cross appeals, arguing that the court improperly denied him offer of compromise interest. We affirm the judgment of the trial court.

The court found the following facts, which are unchallenged on appeal. In 1981, the plaintiff purchased the four story walk-up commercial building at 70 South Main as an office for his sail-making business. There was a single parking space at 70 South Main. The defendant told the plaintiff that he needed more parking for 70 South Main to comply with zoning regulations. The defendant approved a site plan for 70 South Main that involved the plaintiff buying the vacant lot across the street at 65 South Main and creating forty-four parking spaces there. The plaintiff did so, and the defendant issued a certificate of zoning compliance in 1984 for both properties.

In 1985, the plaintiff sold his sail-making business but kept the building. The buyers remained at 70 South Main for one year before moving out. When they did, the plaintiff began leasing space at 70 South Main to a number of commercial tenants. Lessees included a barbershop and a housing services office on the first floor, Macedonia Church on the second floor as well as parts of the third and fourth floors, a photo-gift business on the third floor, and several crafts persons on the fourth floor. The court did not expressly find but it is undisputed that there was also a residential apartment on the fourth floor. For most of the next fifteen years, the building was 95 to 100 percent occupied.

When the plaintiff bought 70 South Main, there was abundant on-street parking nearby. Beginning in 1990, however, the defendant enlarged no-parking zones and converted several side streets into through streets. As

a result, on-street parking grew steadily more limited. In 1996, when the plaintiff learned of the defendant's interest in building a new police headquarters on land that included his parking lot at 65 South Main, he and his tenants grew concerned that they and their customers would have nowhere to park. They expressed this concern to city officials, who offered the plaintiff and his tenants forty parking permits at the South Norwalk train station, which would expire after ten years, as a compromise. The plaintiff and his tenants rejected this offer because they asserted that those spaces were far away, unpleasant, and possibly dangerous. The plaintiff stressed in his talks with two subsequent mayors of Norwalk that, if the defendant condemned his parking lot at 65 South Main, it would cripple operations at 70 South Main.

In February, 2002, the defendant condemned the parking lot at 65 South Main and paid the plaintiff $127,000 as just compensation for it. *Norwalk* v. *Barton*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-02-0187554-S, 2009 WL 323785, *2 (January 27, 2009) (judgment as to adequacy of compensation for 65 South Main). The plaintiff asked the Superior Court to review the defendant's statement of just compensation, arguing that 65 South Main was worth $350,000. Id. In addition, the plaintiff twice tried to amend his pleadings in that case to add a claim for losses to 70 South Main as a result of the taking of 65 South Main. The defendant successfully objected to both amendments.

The parties' experts testified in that proceeding only to the fair market value of 65 South Main standing alone. Id., *1. Specifically, both parties' real estate appraisers agreed that "the highest and best use" for 65 South Main—which is the standard measure of just compensation; *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 272 Conn. 14, 25, 861 A.2d 473 (2004)—would be "a mixed use development built to the maximum permitted by zoning containing one or more of the following three uses permitted by the current zoning regulations; a restaurant and taverns, multifamily dwellings, off-street parking, retail, personal and business services." *Norwalk* v. *Barton*, supra, 2009 WL 323785, *3. The defendant admitted that under the "highest and best use" test, 65 South Main was actually worth closer to $255,000. Id. Although both parties' experts agreed that the property's highest and best use was a mixed use development and although both experts valued it as such, at oral argument on the last day of trial, the defendant urged the court to value 65 South Main instead as a parking lot, since there was no evidence that the plaintiff intended to convert it from that use, and to reduce its value accordingly. Id., *7.

On January 27, 2009, the court rendered judgment in favor of the plaintiff in that case. The court found that

65 South Main was worth $310,000 as a mixed use development and awarded the plaintiff $310,000 in just compensation, minus the $127,000 that the defendant had already paid the plaintiff, plus interest, fees, and costs. Id., *10. As the defendant had requested, the court also calculated 65 South Main's value as a parking lot and found it to be $334,000.[2] Id.

Because the plaintiff could not recover for losses to 70 South Main in the action concerning 65 South Main, he filed a second action—the subject of this appeal— in November, 2003, in which he alleged that the defendant had inversely condemned 70 South Main when it took 65 South Main. A four day trial to the court occurred in February, 2013. The plaintiff called four witnesses, namely, himself, his expert real estate appraiser, a former tenant of 70 South Main, and a current tenant of 70 South Main. The defendant chose to call no witnesses. Instead, when the plaintiff rested, the defendant moved for a judgment of dismissal on the ground that the plaintiff had failed to make out a prima facie case. After the court took that motion under advisement, the defendant rested without presenting a case-in-chief.

On August 28, 2013, the court rendered judgment in favor of the plaintiff on his claim for the inverse condemnation of 70 South Main. The court awarded him $899,480 in damages plus $543,384.49 in prejudgment interest. The court found that the lack of parking, caused by the taking of 65 South Main by eminent domain, "ha[d] substantially destroyed the [plaintiff's] ability to operate the property as a leasable facility and enjoy even a modicum of financial success. The evidence shows the lack of parking, which the [defendant] initially insisted upon, reduced the . . . [property's] chances of commercial success to negligible or nonexistent" and amounted to "a substantial destruction of the [plaintiff's] ability to enjoy or use the property . . . ." As such, the plaintiff "proved [his] claim of inverse condemnation."

In concluding that the plaintiff's use of 70 South Main had been substantially destroyed, the court relied primarily on three categories of evidence: (1) evidence of the building's lease rate; (2) evidence of the building's income; and (3) evidence of the building's fair market value.

First, as to the building's lease rate, the court found that the percentage of leased space in 70 South Main had declined from more than 90 percent in 2001 to 5 percent in 2006, and had rebounded slightly to 10 percent in 2011. After the taking of 65 South Main in February, 2002, the Family and Children's Aid Society of Fairfield County, which leased three quarters of the first floor of 70 South Main, told the plaintiff that it would leave as soon as its lease expired due to the lack of parking. The building's largest tenant—Macedonia

Church, on the second floor and parts of the third and fourth floors—let its lease lapse and began looking for alternative locations, citing parking concerns.[3] Immediately after the taking of 65 South Main, the plaintiff lost the third and fourth floor tenants, who also cited the lack of parking as their reason not to renew. One long-time lessee who operated a barbershop on the first floor of 70 South Main explained: "It just doesn't pay to open any more . . . the parking situation has just killed us. . . . Nobody wants to pay a $15 or $25 fine to get a $12 haircut."

The plaintiff tried to rent space to new tenants. Although prospective tenants found 70 South Main attractive and otherwise suitable, they were dissuaded by the lack of parking. By the time of trial, only two tenants leased space at 70 South Main—a bail bond office and a cell phone store, both of which "lease[d] small areas and [were] unlikely to expand. The bail bond office, of course, ha[d] a unique situation being located literally across the street from the [new] police station. The cell phone store owner walk[ed] to work and the clientele [was] mostly walk-in." Together, these two tenants occupied only 10 percent of the building. The court found that the "remainder of the building will attract tenants only by rock bottom rents, and these will be tenants for which parking is not an issue, likely a small and transient group."

Second, as to the building's annual operating income, the court found that it had declined from $94,080 in 2001 to $20,661 in 2006, and rebounded slightly to $29,221 in 2011.[4]

Third, as to the building's fair market value, the court found that it had declined from $1.1 million before the taking to $200,520 after the taking. At trial, the plaintiff's expert real estate appraiser testified that in a suburban market, "parking is the lifeline of [a] building. You take the parking away; you've gutted the building—the value of a building." That expert's appraisal report, which the plaintiff submitted into evidence, noted that 70 South Main's value as an office building after the taking "may be lower than the value of the land at 70 S. Main Street as if vacant and available for development." The plaintiff's expert also testified that the value was "getting so low, it's virtually a tear-down at this point. . . . [W]e're pretty close to tear-down value."[5]

Finally, in addition to these three primary categories of evidence, the court found that the building's upkeep had been affected. Contractors that the plaintiff hired to repair the roof, windows, leaks, and heating system of 70 South Main were stymied by the defendant's refusal to issue the necessary permits on the ground that 70 South Main no longer had adequate parking and so was not zoning compliant. Consistently, when the plaintiff inquired of the defendant's zoning officials in the years after the taking of 65 South Main, he was told

either, "no parking, no permits," or, "there's pending litigation; we can't talk to you." This created difficulties for the plaintiff and his tenants.[6]

In short, the court found that "the record [was] quite convincing that the economic fortunes of 70 South Main took a considerable turn for the worse . . . a result that [the plaintiff] had accurately predicted," and that this record established an inverse condemnation.

As to the defendant's various counterclaims and special defenses, the court found in favor of the plaintiff on those as well. One such special defense was judicial estoppel. The defendant had argued that the plaintiff was judicially estopped from bringing an action for the inverse condemnation of 70 South Main because: (1) the plaintiff's position in the previous litigation that 65 South Main's highest and best use was as a mixed use development was "completely inconsistent" with his position in this litigation that he would have continued using 65 South Main as a parking lot; and (2) his inconsistent positions gave him the unfair advantage of being able to bring the inverse condemnation action for losses to 70 South Main. The court disagreed, finding that the positions were consistent and that the plaintiff derived no unfair advantage.

The defendant appealed from the judgment to this court, arguing that: (1) judicial estoppel barred the plaintiff's recovery for losses to 70 South Main; and (2) in any case, the interference with the plaintiff's use of 70 South Main was not so substantial as to be an inverse condemnation. While that appeal was pending, the plaintiff moved for offer of compromise interest pursuant to General Statutes § 52-192a, arguing that he satisfied the statute because his 2009 offer[7] to settle the case was "for a sum certain" and he recovered an amount "equal to or greater than [that] sum certain" at trial. The court denied the plaintiff's motion on the grounds that his 2009 offer asked for considerably more than a sum certain and, in any case, he had not recovered all requested relief at trial. The plaintiff appealed from that judgment and this court consolidated the two appeals.

We address each of the three issues in turn.

## I

We begin with the defendant's claim that judicial estoppel barred the plaintiff's recovery. Specifically, the defendant argues that, because the plaintiff previously had asserted that 65 South Main should be valued according to its "highest and best use" as a mixed use development and because he had received just compensation for it on that basis, he was judicially estopped in the inverse condemnation action from assuming that it was still a parking lot when he asserted 70 South Main's value prior to the taking. We disagree.

"Because the rule is intended to prevent improper

use of judicial machinery . . . judicial estoppel is an equitable doctrine invoked by a court at its discretion . . . . Accordingly, our review of the trial court's decision not to invoke the doctrine is for abuse of discretion." (Citations omitted; internal quotation marks omitted.) *Assn. Resources, Inc.* v. *Wall*, 298 Conn. 145, 171, 2 A.3d 873 (2010).

"[J]udicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding. . . . [J]udicial estoppel serves interests different from those served by equitable estoppel, which is designed to ensure fairness in the relationship between parties. . . . The courts invoke judicial estoppel as a means to preserve the sanctity of the oath or to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings. . . . Typically, judicial estoppel will apply if: 1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel. . . . We further limit judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain. . . . Thus, courts generally will not apply the doctrine if the first statement or omission was the result of a good faith mistake . . . or an unintentional error." (Citations omitted; internal quotation marks omitted.) *Dougan* v. *Dougan*, 301 Conn. 361, 372–73, 21 A.3d 791 (2011); see also *Dept. of Transportation* v. *White Oak Corp.*, 319 Conn. 582, 612, 125 A.3d 988 (2015) (same).

Here, because the court properly found that the first and third of the three conditions had not been met, it did not abuse its discretion when it rejected the defendant's judicial estoppel claim.

As to the first condition, the plaintiff has not taken clearly inconsistent positions. The defendant argues that the plaintiff took two clearly inconsistent positions because: (1) in the previous eminent domain proceeding, the plaintiff asserted that "the highest and best use of 65 South Main Street was a mixed use development"; and (2) in this litigation, the plaintiff asserted that 70 South Main would have had "the use of 65 South Main Street as a parking lot" but for the defendant's taking it. We conclude that these positions are not clearly inconsistent, for two reasons.

First, the valuation of a property according to its highest and best use—the standard measure of just compensation—is understood to be potentially counterfactual. The law does not require that the owner actually devote the property to that use. See *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, supra, 272 Conn. 25 ("[i]n determining its highest and best use, the trial [court] must consider whether there was a

*reasonable probability* that the subject property *would be put* to that use in the reasonably near future, and what effect such a prospective use may have had on the property's market value at the time of the taking" [emphasis added; internal quotation marks omitted]); see also *Bristol* v. *Tilcon Minerals, Inc.*, 284 Conn. 55, 67, 931 A.2d 237 (2007) ("the trial court's finding that there was a reasonable probability that the property *could or would* be used for residential development in the reasonably near future and its corollary finding that the highest and best use of the property was for residential development were not clearly erroneous" [emphasis added]). Thus, the plaintiff's valuation of 65 South Main as a mixed use development was not an assertion that he would have stopped actually using 65 South Main as a parking lot.

Second, the plaintiff's argument in the eminent domain proceeding that 65 South Main's highest and best use *standing alone* was a mixed use development does not contradict his argument in this litigation that 65 South Main's and 70 South Main's highest and best use *together* was an office building on 70 South Main and a parking lot at 65 South Main. While this tack could give the plaintiff an unfair advantage if 65 South Main were worth dramatically less as a parking lot than as a mixed use development, the two positions are not, without more, inconsistent. Because clearly inconsistent positions are the crux of a judicial estoppel claim, the absence of this first condition alone justifies the court's decision.

As to the third condition, the plaintiff derived no unfair advantage from simultaneously taking his two positions. On the contrary, the plaintiff's two positions allowed him to recover once for 65 South Main and once for 70 South Main, the same as if in the prior litigation he had valued 65 South Main as a parking lot instead of as a mixed use development. Although the plaintiff may have recovered more than the defendant preferred, he has not gained an unfair advantage.

The defendant, however, argues that the plaintiff gained an "enormous advantage . . . in this case" because "[h]ad the [plaintiff] been bound to [his] prior position . . . the linchpin of [his] inverse condemnation case would have disappeared." In short, the defendant argues that the "advantage" the plaintiff gained was being able to bring his action for the inverse condemnation of 70 South Main at all. In making this argument, the defendant confuses the baseline against which an "advantage" is measured. The question is whether the party gained more by taking inconsistent positions than it would have by taking consistent positions.[8] Two cases are on point.

In the first case, the parties extensively negotiated a dissolution agreement, engaging in a quid pro quo where each party ended up with some terms they liked and

some they did not. *Dougan* v. *Dougan*, supra, 301 Conn. 365 n.3, 373. The plaintiff represented to the court that the final agreement was fair and reasonable, and the court adopted the agreement in its entirety. Id., 364–65. Then, when it came time to enforce a clause in the agreement that disfavored the plaintiff, he argued that the clause was void as against public policy. Id., 369. Had he succeeded, he would have gotten the terms that he liked and denied the defendant one of the terms that she had negotiated for in exchange. See id., 375. By contrast, had the plaintiff argued that the clause was unenforceable before the court adopted the agreement, the defendant presumably would have negotiated for a different favorable clause in its stead. Our Supreme Court held that the defendant was judicially estopped from arguing that a clause in the agreement that he had previously stated under oath was fair and reasonable was actually void as against public policy. Id.

In the second case, when a plaintiff tried to amend its complaint to add three new counts, the defendants successfully objected on the ground that the new counts did not relate back to the same series of events as the original counts. *MacDermid, Inc.* v. *Cookson Group, PLC*, 149 Conn. App. 571, 579–80, 89 A.3d 447, cert. denied, 312 Conn. 914, 93 A.3d 597 (2014). Then, when the plaintiff filed the new counts as a separate action, the defendants moved to dismiss that new action on the ground that it was barred by the prior pending action doctrine because it arose out of the same series of events as the first action. Id., 580–81. Had the defendants taken consistent positions, they would have had to face the plaintiff's new counts, on the merits, in at least one of the two actions; by taking inconsistent positions, the defendants were able to block the new counts entirely. See id., 581–82. The court held that the defendants were judicially estopped from arguing that the prior pending action doctrine barred the plaintiff's second action. Id., 582.

These two cases establish that the question is whether a party gained more by taking inconsistent positions than it would have by taking consistent positions. Here, by contrast, the plaintiff's two positions allowed him to recover once for 65 South Main and once for 70 South Main, the same as if he had valued 65 South Main as a parking lot instead of as a mixed use development. He gained no advantage, let alone an unfair one.[9]

Because the plaintiff's two positions were not clearly inconsistent and because he derived no unfair advantage from asserting them, we conclude that the court did not abuse its discretion in rejecting the defendant's judicial estoppel claim.

## II

Second, we consider the defendant's claim that it did

not inversely condemn 70 South Main because it did not "substantially destroy" the plaintiff's use and enjoyment of the building. We disagree. In making this argument, the defendant relies heavily on the continued presence of Macedonia Church and two small street-level tenants. The court, however, found that the plaintiff has been unable to lease out 90 to 95 percent of 70 South Main since the taking of 65 South Main and that the building's value reflects this, having declined to near that of a vacant lot. It does not appear that the building can be used for any other reasonable purpose. Although the defendant points to the continued presence of Macedonia Church, we defer to the court's finding that the church's presence was an outlier and not representative of the building's actual economic viability. That 10 percent of the building was still leased by two small street-level shops means that there was no total destruction of use. We conclude, however, that on these facts, the defendant substantially destroyed the plaintiff's ability to use and enjoy 70 South Main. Accordingly, an inverse condemnation has occurred.

We begin with the standard of review. "Whether private property has been taken by inverse condemnation is a question of law subject to our plenary review." *Bristol* v. *Tilcon Minerals, Inc.*, supra, 284 Conn. 83.

"Inverse condemnation is a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency. . . . An inverse condemnation claim accrues when the purpose of government regulation and its economic effect on the property owner render the regulation substantially equivalent to an eminent domain proceeding . . . . Accordingly, an inverse condemnation action has been aptly described as an eminent domain proceeding initiated by the property owner rather than the condemnor. . . .

"The word taken in article first, [§ 11, of] our state constitution[10] means the exclusion of the owner from his private use and possession, and the assumption of the use and possession for the public purpose by the authority exercising the right of eminent domain. . . . Although property may be taken without any actual appropriation or physical intrusion . . . there is no taking in a constitutional sense unless the property cannot be utilized for any reasonable and proper purpose . . . as where the economic utilization of the land is, for all practical purposes, destroyed. . . . A constitutional taking occurs when there is a substantial interference with private property which destroys or nullifies its value or by which the owner's right to its use or enjoyment is in a substantial degree abridged or destroyed." (Citation omitted; internal quotation marks omitted.) Id., 83–84.

In short, inverse condemnation requires either: (1) total destruction of the property's economic value; or (2) substantial destruction of the owner's ability to use and enjoy the property. Id., 85. Here, the plaintiff concedes that prong one was not met. This appeal concerns only whether prong two was met.

The parties agree that three inverse condemnation cases are especially relevant and define the spectrum of governmental action. Of these, one case involved interference so absolute as to clearly constitute a taking; the other two involved minor interference insufficient to constitute a taking.

In the first case, this court held that property had been inversely condemned. See *Citino* v. *Redevelopment Agency*, 51 Conn. App. 262, 281–82, 721 A.2d 1197 (1998), overruled in part on other grounds by *Kaczynski* v. *Kaczynski*, 294 Conn. 121, 130 n.10, 981 A.2d 1068 (2009). In that case, the defendant had condemned all the buildings in an area except the plaintiff's and left that building "stand[ing] by itself, in the midst of the deteriorated and boarded-up buildings owned by the defendant . . . ." (Internal quotation marks omitted.) Id., 281. As a result, the court found that the plaintiff's building "ha[d] no actual economic value now"; (internal quotation marks omitted) id., 283; and the "character and use of the plaintiff's building ha[d] been destroyed . . . ."[11] Internal quotation marks omitted.) Id., 281. Nevertheless, at the time of trial, two of the building's six apartments still had tenants who were paying rent. Id., 269. Because the building retained some use, the trial court did not hold that an inverse condemnation had occurred. Id., 277. On appeal, this court disagreed and held that "[i]t is sufficient if use of property is severely restricted and its profitability greatly reduced as a result of the action of the government." Id., 278–79. We concluded that an inverse condemnation had occurred.[12]

In the second case, this court held that property had not been inversely condemned. See *Sinotte* v. *Waterbury*, 121 Conn. App. 420, 437, 995 A.2d 131, cert. denied, 297 Conn. 921, 996 A.2d 1192 (2010). In that case, the defendant's sewer system caused major sewage backups in the finished basement of the plaintiffs' home roughly every five years. See id., 423, 427. The building's pipes also gurgled and the first floor sinks sometimes had sand, twigs, and debris deposited from the sewer backup. Id., 425. As a result, the trial court found that the plaintiff's home lost 30 percent of its fair market value. Id., 427. Nevertheless, the court found that the property "substantially retained both economic value and its prior use as a residence" and so held that no inverse condemnation had occurred. Id., 437. On appeal, this court agreed and affirmed in relevant part.

In the third case, our Supreme Court held that prop-

erty had not been inversely condemned. See *Bristol* v. *Tilcon Minerals, Inc.*, supra, 284 Conn. 86. In that case, leachate from the defendant's landfill had contaminated the groundwater under the plaintiff's property, creating a stigma. Id., 82. As a result, the trial court found that the plaintiff's property had lost 50 percent of its fair market value. Id., 83. Nevertheless, the contamination did not affect the plaintiff's current use of the property as an access route to mines and as a storage site for mined minerals. Id., 84. Nor did the contamination *physically* restrict the plaintiff from using the land as it wished, for a residential development; the plaintiff anticipated using the public water system—not wells—to serve the lots. See id. The only harm was stigmatic. See id., 82. Although the trial court did not find that the plaintiff's right to use the property was "substantially abridged or destroyed," it held that an inverse condemnation had occurred given the 50 percent reduction in value. (Internal quotation marks omitted.) Id., 84. Our Supreme Court reversed, holding that because the stigma "had no effect on [the plaintiff's] present mining-related activities and [the plaintiff had] introduced no evidence that the property could not be marketed for residential development even if burdened by a stigma," no inverse condemnation had occurred.[13] Id., 85–86.

These three cases all present fairly extreme scenarios. In *Citino*, the case holding that property had been inversely condemned, the court found that the "use of the plaintiff's building ha[d] been destroyed"; (internal quotation marks omitted) *Citino* v. *Redevelopment Agency*, supra, 51 Conn. App. 281; and that it retained "no actual economic value . . . ." (Internal quotation marks omitted.) Id., 283. In *Sinotte* and *Bristol*, holding that property had not been inversely condemned, the court found that the properties retained at least half their economic value and substantially retained all relevant uses. *Sinotte* v. *Waterbury*, supra, 121 Conn. App. 437; see also *Bristol* v. *Tilcon Minerals, Inc.*, supra, 284 Conn. 84.

The plaintiff's case falls between these two ends of the spectrum, but closer to *Citino* than to *Sinotte* and *Bristol*. The court found that 90 percent of the plaintiff's building is now effectively unleasable. The court found that the lack of parking "has *substantially destroyed* the [plaintiff's] ability to operate the property as a leasable facility and enjoy even a modicum of financial success. The evidence shows [that] the lack of parking, which the [defendant] initially insisted upon, reduced the . . . [property's] chances of commercial success to *negligible or nonexistent*." (Emphasis added.) The economic value of the plaintiff's property reflects this. The court found that it has dropped by 81.77 percent, from $1.1 million to $200,520, which, according to the appraisal of the plaintiff's expert witness, "may be lower than the value of the land . . . if vacant and available for development."

These factual findings set the plaintiff's case apart from *Sinotte* and *Bristol*. In those two cases, the courts found that the properties substantially retained their preexisting uses even after the alleged inverse condemnation. *Sinotte* v. *Waterbury*, supra, 121 Conn. App. 437; see also *Bristol* v. *Tilcon Minerals, Inc.*, supra, 284 Conn. 84. Here, by contrast, the court found, as in *Citino*, that "even though part of [the plaintiff's] building continued to be rented . . . the economic viability of his property was nonexistent" as a result of the defendant's action.

The defendant argues, however, that the plaintiff's loss falls short of the "complete taking" required by *Bristol*, pointing especially to Macedonia Church's continued occupancy of roughly 40 percent of the building's office space, albeit, without a lease, on a month-to-month basis, paying highly discounted rent.

We note at the start that *Bristol* requires not a "complete taking"; *Bristol* v. *Tilcon Minerals, Inc.*, supra, 284 Conn. 85; but rather government action "*substantially* equivalent"; (emphasis added; internal quotation marks omitted) id., 83; to a complete taking by virtue of its "*substantial* destruction of an owner's ability to use or enjoy the property." (Emphasis added.) Id., 85. That is precisely what the court found occurred in this case.

As to Macedonia Church's continued occupancy, at trial, the parties hotly contested what that occupancy said about the economic viability of 70 South Main. The court's factual findings resolved that question, and the defendant does not challenge those findings on appeal. Accordingly, we reject the defendant's argument that we should reweigh the significance of Macedonia Church's month-to-month tenancy as an indicator of 70 South Main's economic viability.

At trial, the defendant argued that the church's month-to-month tenancy of roughly 40 percent of the building's space—because it had continued for so long and showed no sign of changing—should be treated as no different from a lease of that space. On this view, the building remained about one-half occupied and its annual operating income was still roughly $30,000.

The plaintiff, by contrast, argued that the church's month-to-month tenancy was a red herring as far as 70 South Main's present economic viability was concerned, because: (1) the church had repeatedly said that it was trying to leave; (2) the church was unlikely to remain a tenant of that office space; and (3) the church remained only because the defendant was in effect propping it up with its selective offer of free parking to churchgoers.

The plaintiff's expert testified to this effect, saying that the church's continued presence was an outlier. He opined that "[a]ll tenants leave at some time and a church is a specialized use. . . . [T]hat building when

you look at it, it's not really conducive for a church. . . . It's much more conducive to general office use, so that would be the most likely user . . . ." The plaintiff's "chances of getting [another] church to fit in that space are slim to none." He opined that "[i]f the church finds a suitable space, I know they'll go," and that, when that happened, the plaintiff probably would not be able to find another tenant of any sort to replace the church.

In finding in favor of the plaintiff, the court largely credited his expert on this point. It took the lease rate—not the occupancy rate—as the best metric of 70 South Main's economic viability and treated the continued presence of the church as an outlier. Accordingly, the court found that the percentage of leased space in the building had declined from more than 90 percent before the taking to 5 to 10 percent after the taking. The court expressly considered and rejected the defendant's argument that Macedonia Church's continued presence proved that 70 South Main could still be used "as a leasable facility and enjoy even a modicum of financial success."

The court found that 70 South Main's other two remaining tenants "lease[d] small areas and [were] unlikely to expand. The bail bond office, of course, has a unique situation being located literally across the street from the police station. The cell phone store owner walks to work and the clientele is mostly walk-in." Together, these two tenants occupied only 10 percent of the building. The court found that the "remainder of the building will attract tenants only by rock bottom rents, and these will be tenants for which parking is not an issue, likely a small and transient group." The presence of these two lessees, whose customers were unique in their lack of need for parking, did not rebut the court's conclusion that the defendant had substantially destroyed the plaintiff's ability to use 70 South Main as an office and retail building.

There is no evidence in the record, and the trial court did not find, that the building could still be used for some other reasonable purpose, such as residential apartments. Indeed, given that a portion of 70 South Main was residential apartments prior to the taking of 65 South Main, that those tenants left due to the lack of parking, and that the plaintiff found no one willing to replace them, the court likely concluded that such other uses were no more viable a use for 70 South Main than office or retail space. The report of the plaintiff's expert that the property might now be worth more vacant than with the building on it further supported that conclusion.[14]

We thus conclude that the court did not err in holding that the defendant had inversely condemned 70 South Main when it deprived the building of parking because the result was to substantially destroy the plaintiff's ability to use and enjoy his office building.

## III

Finally, we consider the plaintiff's argument on cross appeal that the court erred in denying him offer of compromise interest under § 52-192a. The plaintiff's argument is in two parts. He argues that: (1) his offer to settle the case for $500,000 with interest, plus unspecified costs up to $20,000, plus all necessary permits, was an offer to settle the case for "a sum certain," as required by § 52-192a (a), or in any event, his offer met the alternative test for such offers set out by this court in *Kazlon Communications, LLC* v. *American Golfer, Inc.*, 82 Conn. App. 593, 847 A.2d 1012 (2004); and (2) the judgment of $899,480 with interest was "equal to or greater than" what he requested in his offer, as required by § 52-192a (c). We disagree with both parts of the plaintiff's argument.

We begin with the standard of review. "The question of whether the trial court properly awarded [offer of compromise] interest pursuant to § 52-192a is one of law subject to plenary review." *LaPlante* v. *Vasquez*, 136 Conn. App. 805, 810, 47 A.3d 897 (2012).

The court denied the plaintiff offer of compromise interest on the ground that he failed to meet two requirements of § 52-192a: (1) that a plaintiff offer to settle his action "for a sum certain";[15] and (2) that, after the defendant rejects the offer, the plaintiff recover "an amount equal to or greater than the sum certain" he requested.[16]

First, the plaintiff argues that his offer was for a "sum certain." The offer included three demands: (1) $500,000 with interest; (2) "all appraisal fees and other fees and costs expended by the Plaintiff to prosecute this action up to $20,000.00"; and (3) "all necessary land use certificates and/or approvals to allow Plaintiff and his successors in interest to use the property at 70 South Main Street for its intended use as a mixed use retail/office building." The plaintiff argues that the first demand is clearly for a sum certain, the second demand is capped at a certain amount and so qualifies, and although the third demand is neither monetary nor specific, "the [defendant] knew which permits [the plaintiff] was seeking" and so it qualifies, too. We agree that the first demand was for a sum certain, but we conclude that the other two demands were not. The second demand was inherently variable; the cap limited but did not eliminate uncertainty as to the amount. As to the third demand, not only was it vague as to what was sought, it was not for a sum of money.

The plaintiff argues that he is saved by this court's decision in *Kazlon Communications, LLC* v. *American Golfer, Inc.*, supra, 82 Conn. App. 593, which permits nonmonetary conditions in a § 52-192a offer. In *Kazlon Communications, LLC*, a plaintiff offered to settle its case for $37,500 plus the withdrawal of the defendants'

counterclaim. Id., 599. The defendants rejected that offer. Id., 600. The plaintiff, after obtaining summary judgment on both the complaint and counterclaim, asked the court for offer of compromise interest. Id., 595, 599. This court held that the plaintiff's offer met the requirements of § 52-192a because it merely encompassed both halves of the litigation—the complaint and counterclaim—and offered to settle it for a precise sum of money. Id., 600.

The plaintiff argues that his demand for permits is like the plaintiff's demand in *Kazlon Communications, LLC*, that the defendants withdraw their counterclaim. Even if that were true, the "up to $20,000" term would still violate the "sum certain" requirement of § 52-192a. Moreover, it is not true. The plaintiff demanded more than money and an end to both halves of the inverse condemnation action.[17] He also demanded "all necessary land use certificates and/or approvals . . . ." Accordingly, his offer was not to settle the litigation merely for "a sum certain," as required by § 52-192a. "[B]ecause § 52-192a is punitive, we are required to construe it with reasonable strictness . . . ." (Emphasis omitted; internal quotation marks omitted.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 297 Conn. 105, 149, 998 A.2d 730 (2010). *Kazlon Communications, LLC*, is already in some tension with the plain language of § 52-192a, and we are not inclined to expand it further.

Second, the plaintiff argues that he recovered "an amount equal to or greater than the sum certain" he requested. The relief requested was $500,000 with interest, plus up to $20,000, plus all necessary permits. The relief recovered was $899,480 with interest and no permits. Even if "sum certain" permits a plaintiff to include nonmonetary demands in his offer of compromise, the plaintiff must recover relief at least "equal to" that demanded. Here, the plaintiff recovered more money but no permits. His recovery was different from—not equal to or greater than—his demand.[18] Accordingly, he did not recover an amount "equal to or greater than" his demand, as required by § 52-192a.

Because the plaintiff failed to meet the requirements of § 52-192a, the court did not err in denying him offer of compromise interest.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The two plaintiffs in this case are Robert Barton and Sonoson, LLC. Barton owned 70 South Main Street when it was taken, and he alone filed the inverse condemnation action. While the case was pending, he quitclaimed his interest in 70 South Main Street to Sonoson, LLC, and filed a motion to join it as a plaintiff in this action, which the trial court granted. Sonoson, LLC, is a family partnership—Barton and his wife own the majority interest and each of their three children owns a smaller share. For ease of reference, we refer to Barton as the plaintiff throughout this opinion.

[2] This alternative valuation of 65 South Main is relevant to the defendant's judicial estoppel claim that the plaintiff obtained an unfair advantage by valuing 65 South Main as a mixed use development rather than as a park-

ing lot.

[3] The court found that Macedonia Church remains a tenant to this day—albeit one without a lease and on a month-to-month basis, paying far below market rent—only because it has found nowhere else to go and because the defendant owns a dirt lot near 70 South Main where it allows the church's members to park for free. The lot is not available to other tenants of 70 South Main. The church's Reverend George Cromwell testified that without this lot, his church "would be in extreme difficulties and would have to look for alternative, even if temporary, accommodations."

On the issue of what one could infer from the church's continued presence, the plaintiff's expert testified without rebuttal that, not only was the church actively seeking to leave, but also "[a]ll tenants leave at some time and a church is a specialized use. . . . [T]hat building when you look at it, it's not really conducive for a church. . . . It's much more conducive to general office use, so that would be the most likely user . . . ." The plaintiff's "chances of getting [another] church to fit in that space are slim to none." The plaintiff's expert witness agreed with the defendant's counsel that "the logical use of that space . . . based on the market, is office space . . . ." The plaintiff's expert added, however, that due to the lack of parking, he doubted the plaintiff would be able to find a replacement tenant of any sort when the church left. He opined that the defendant had "forced [the plaintiff] . . . between a rock and a hard place" by giving him the choice to either let the church stay paying "ridiculously low" rent as long as possible, or let the church leave and likely fail to find a replacement.

[4] The exhibit from which the court derived these numbers notes that "Operating Income is defined as Gross Rents received less Operating Expenses. Operating Expenses exclude mortgage interest and principal, depreciation, and capital improvements. Services provided 'in-kind' to the property are not reflected in Operating Expenses."

[5] Although the court did not specifically recite in its statement of facts the testimony and report of the plaintiff's expert that the value of 70 South Main approached that of a vacant lot, the court did note that "[o]n the whole, the court accepts [the] analysis [of the plaintiff's expert] as consistent with commercial real estate appraisal purposes and an appropriate means to ascertain market value." Elsewhere in its opinion, the court noted that the "court generally accepts the report and testimony of [the plaintiff's expert] that the after taking value of [70 South Main] is slightly over $200,000, a decrease of over 80 percent from before taking value."

[6] The defendant argues that we should ignore these difficulties because the court's statement that they were "arguably not *directly* relevant" to the inverse condemnation issue meant that the court did not base its decision on them. (Emphasis added.) On the contrary, the court made express findings of fact on this point and indirect evidence is still evidence. See, e.g., *Griffin* v. *Nationwide Moving & Storage Co.*, 187 Conn. 405, 422–23, 446 A.2d 799 (1982).

[7] The plaintiff's offer stated:

**"OFFER OF COMPROMISE**

"Pursuant to General Statutes § 52-192a and Practice Book § 17-14, the Plaintiff, hereby offers to compromise the above-captioned matter as follows:

"1. Plaintiff stipulates to damages in the total amount of $500,000.00 to be paid by the defendant, City of Norwalk, to the Plaintiff as full settlement of the claims underlying this action.

"2. Defendant agrees to pay Plaintiff interest of 7.5% per annum on this amount from the date of the taking, January 17, 2002, to the date of payment of damages set forth above.

"3. Defendant agrees to pay all appraisal fees and other fees and costs expended by the Plaintiff to prosecute this action *up to $20,000.00*.

"4. Defendant agrees to issue *all necessary land use certificates and/or approvals* to allow Plaintiff and his successors in interest to use the property at 70 South Main Street for its intended use as a mixed use retail/office building." (Emphasis added.)

[8] Here, the plaintiff's two positions were not inconsistent, but for purposes of this condition we analyze them as if they were.

[9] The obvious argument, which the defendant does not make, would be that the plaintiff derived an advantage by valuing 65 South Main so as to maximize its independent value in the proceeding devoted solely to compensation for 65 South Main and then undervalued 65 South Main as a parking lot so as to inflate the value of the building it served, 70 South Main, in the proceeding devoted solely to compensation for 70 South Main.

The defendant does not make this argument because the court in the eminent domain proceeding calculated the value of 65 South Main as a parking lot and found that value to be $334,000; slightly *higher* than the $310,000 value it found for 65 South Main as a mixed use development. *Norwalk* v. *Barton*, supra, 2009 WL 323785, *10. Although it is conceivable that the plaintiff could have gotten increased damages for 65 South Main by valuing it as a mixed use development in the eminent domain proceeding, there is no evidence that that happened here—indeed, what evidence does exist suggests the opposite.

[10] Article first, § 11, of the constitution of Connecticut provides: "The property of no person shall be taken for public use, without just compensation therefor."

[11] The trial court in *Citino* found that the property was still worth $50,000 to $75,000 compared to its pre-taking value of roughly $150,000 and that "with completed redevelopment of the area the value m[ight] increase." *Citino* v. *Redevelopment Agency*, Superior Court, judicial district of Hartford-New Britain, Docket No. CV-95-0545209-S (January 30, 1997) (18 Conn. L. Rptr. 567, 573), aff'd and remanded, 51 Conn. App. 262, 721 A.2d 1197 (1998), overruled in part on other grounds by *Kaczynski* v. *Kaczynski*, 294 Conn. 121, 981 A.2d 1068 (2009). Nevertheless, the court found that "[f]or all intents and purposes th[e] building ha[d] no actual economic value" because the plaintiff had taken on nearly $250,000 in debt to renovate it, at the defendant's urging, and the building's present rents were too low to recoup that cost. Id. The same reasoning underlay the conclusion of the trial court in *Citino* that even if the defendant finished redeveloping the area, the plaintiff's property would still have no "realistic" economic value. Id.

[12] The defendant opined at oral argument in the present case that *Citino* "would not come out the same way if it were decided after *Bristol* [v. *Tilcon Minerals, Inc.*, supra, 284 Conn. 55]," a more recent inverse condemnation case from our Supreme Court. We note that in *Bristol*, the Supreme Court expressly considered *Citino* and did not overrule it. Id., 85.

[13] The court ultimately held that the plaintiff was still entitled to damages, albeit on a theory of permanent trespass rather than inverse condemnation. *Bristol* v. *Tilcon Minerals, Inc.*, supra, 284 Conn. 91.

[14] The defendant submitted a letter of supplemental authority after oral argument before this court, in which it brought to our attention our Supreme Court's recent decision in *Caruso* v. *Zoning Board of Appeals*, 320 Conn. 315,       A.3d       (2016). We conclude that *Caruso* is consistent with our analysis. In *Caruso*, the court held that, where "the [property owner] offered no evidence of the current value of the property"; id., 320; no evidence of "efforts to market, sell, or develop the property," and no evidence "that the property [was] unfit for any permitted use because of a peculiar characteristic of the property," there was insufficient evidence to prove a taking. (Internal quotation marks omitted.) Id., 325–26. Here, the plaintiff submitted evidence of (1) a drastic decline in the property's value; (2) a decade of failed efforts to market the property; and (3) a peculiar characteristic, in that the property lacked parking. Such evidence was sufficient to prove a taking.

[15] General Statutes § 52-192a (a) provides in relevant part: "[A]fter commencement of any civil action . . . seeking the recovery of money damages, whether or not other relief is sought, the plaintiff may . . . file . . . a written offer of compromise . . . offering to settle the claim underlying the action *for a sum certain. . . .*" (Emphasis added.)

[16] General Statutes § 52-192a (c) provides in relevant part: "After trial the court shall examine the record to determine whether the plaintiff made an offer of compromise which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount *equal to or greater than the sum certain* specified in the plaintiff's offer of compromise, the court shall add . . . eight per cent annual interest on said amount . . . ." (Emphasis added.)

[17] Here, the defendant had raised two counterclaims: (1) a claim for title to 70 South Main if the court held that it had been inversely condemned; and (2) a claim for any post-taking income earned from 70 South Main if the court held that it had been inversely condemned. The court ultimately denied both counterclaims.

[18] We note that even if the permits could be assigned a dollar value, which they were not here, it would have been improper simply to ask whether the plaintiff had recovered an amount equal to or greater than the total of $500,000 with interest, plus $20,000, plus the value of the permits. First, such an approach would nullify the provision of § 52-192a that limits the

relief a plaintiff may seek, in exchange for the withdrawal of an action, to a "sum certain." If the legislature had wanted to allow plaintiffs to request permits or easements or real property or any other nonmonetary relief in an offer eligible for § 52-192a interest, it easily could have done so. It did not. Second, § 52-192a is a punitive statute; *Cardenas* v. *Mixcus*, 264 Conn. 314, 321, 823 A.2d 321 (2003); designed to punish a defendant for the waste of judicial resources that occurs when a defendant fully litigates a case only for the plaintiff to get the exact same relief that he had offered to settle for before trial. See *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 297 Conn. 153 ("interest awarded under § 52-192a is solely related to a defendant's rejection of an *advantageous* offer to settle before trial" [emphasis added; internal quotation marks omitted]). That rationale does not apply in a case, as here, where the defendant may well have been willing to pay a larger sum of money but was unwilling to promise the plaintiff the desired nonmonetary relief. Indeed, the present case illustrates that dilemma particularly well, since it is not even clear that the defendant—or the court— had the authority to give the plaintiff the permits he sought without first going through the required channels. Those channels likely would have included a public hearing with notice to affected third parties, who would have had a right to speak on the matter and who might well have raised legal grounds for denying some permits that the zoning board would have been compelled to obey. See General Statutes §§ 8-6 (duties of zoning board) and 8-7d (notice and hearing requirements). It would hardly serve the purpose of § 52-192a—i.e., to promote the acceptance of reasonable settlement offers; *Cardenas* v. *Mixcus*, supra, 321;—if we were to punish a defendant for refusing an offer that it knew it might be unable legally to fulfill.

———————————————